(No. 23380.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY RASOF, Plaintiff in Error.

*Opinion filed April 24, 1936—Rehearing denied June 3, 1936.*

JOHN B. BODDIE, (ROY S. GASKILL, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, and RICHARD H. DEVINE, of counsel,) for the People.

·Mr. JUSTICE. ORR delivered the opinion of the court:

A jury in the criminal court of Cook county found Henry Rasof, aged thirty-seven, guilty of embezzlement and larceny, and he was sentenced to serve from one to ten years in the penitentiary. He brings the case here for review by writ of error.

Only four witnesses testified for the People and none for the defendant.

Anna Gibbons, who had been a cook for a number of years, opened an account in 1933 with Hornblower & Weeks, a Chicago brokerage house, for the purpose of dealing in stocks. In April, 1934, she was watching the listings on the stock board and in a general conversation with a group of people she said, "It is funny the stocks go down so much." Rasof joined in the conversation and said: "Well, the stocks go down from now on always. It is a very dangerous thing to be in the stock market. The only money to be made is in wheat." Mrs. Gibbons said she understood very little about stocks and absolutely nothing about wheat. Rasof at that time showed her how to read the ticker for future prices of wheat. Mrs. Gibbons and Rasof had a further conversation, and she said she could not trade in wheat because she had just bought stocks. Rasof asked what stocks she had bought, and she replied that she had ordered certain stocks but the order had not been executed. Rasof gave her advice to cancel the order because the firm she was dealing with had recommended to her the worst stock in the market. Two weeks afterwards, while Mrs. Gibbons was on her way to her brokerage office, she again met Rasof. In the meanwhile her stocks were going down. Her husband had recently died and his estate was in probate. On that occasion Rasof represented to her that he was an agent for the New York Life Insurance Company and advised her that she should not be in the stock market; that she should travel, and suggested that she should get an annuity policy with his company. She told him that her money was in the hands of her attorney, who advised her to invest it in government bonds. Rasof continued to tell her what she should do with her money and went over to the probate court with her to learn more about her affairs, there telling her she would lose all her money and bonds unless she deposited them in a safety deposit box under a different name. Acting on this advice she opened an account with Paul Davis

& Co. in July, 1934, under an assumed name. On August 17 she again saw Rasof at Hornblower & Weeks' office. He then told her, "If you will come into the wheat market and out of the stock market you will not only recover your losses in a very short time but you can also take a life annuity. You should not trade with a ·one-horse-joint broker. You should go to a bigger brokerage house." She replied that she did not understand .anything about it, and he said he would tell her how to transfer her stocks and liquidate her account so she could buy wheat and that he would tell her. when to buy and when to sell. She agreed to this plan and offered him a commission of half of the profits from the stocks. At that time she sold American Can and Armour at Hornblower & Weeks' and gave Rasof some of the profits she had made on these stocks.

The proof shows that Rasof had a grain account with Faroll Bros. in his name up until August 1, 1934, but closed it on that date. On or about August 22, 1934, Lee Bredman, a customers' man and solicitor at Faroll Bros., met Rasof, who told him that he would soon have a nice account in which he, Rasof, would have authority to trade. At his request Bredman gave him the proper instruments to have executed for that purpose. The next day Mrs. Gibbons drew $4700 out of her account at Paul Davis & Co.'s, being proceeds from the sale of the Armour and American Can stock, and placed that amount, with $300 additional, or a total of $5000, with Faroll Bros. Rasof met and accompanied her there and introduced her to Bredman. At that time some papers were given to her to sign and she signed them without reading their contents. As shown by exhibits, one was a letter of authority to Rasof to buy and sell for her account in her name, and another was an authority given to Faroll Bros. to retain at their office all statements and notices pertaining to her account. At that time Rasof said a wheat account was to be opened and that he would transfer the money into an account for

wheat. On the following day, August 24, Rasof told Mrs. Gibbons that she should sign some additional papers so her money could be transferred into a wheat account. She then signed People's exhibit 3, a check drawn on Faroll Bros. for $3250, payable to Anna Gibbons and endorsed by Anna Gibbons and Henry Rasof. She testified that at the time she signed People's exhibit 3 she did not know what it was. After signing this check she saw Rasof frequently but did not know she was giving Faroll Bros. authority to retain notices and statements of account at their offices. After several weeks she made inquiry at Faroll Bros. and discovered that there were no transactions for wheat in her account there. Her account showed that the $3250 had been drawn out by Rasof soon after she had deposited it. She asked him why he did it, and he told her that the money was in a separate wheat account. She then returned to Faroll Bros. and had E. M. Rosenthal, the manager, look up the wheat account for her, and he told her there was no account in wheat, either in her name or Rasof's. When she again confronted Rasof with this statement he replied that Rosenthal did not check it. Later he took her to what he called the "wheat pit," and at that time told her that he put the wheat money there.

On a day in October, 1934, Rasof again met Mrs. Gibbons and brought up the subject of annuities, telling her that if she did not get her annuity soon it would cost her several hundred dollars more. He said he did not care to take the money out of the wheat market at that time to pay for her annuity because he expected to make a big profit in wheat and suggested that she put up an initial payment for the annuity. She consented to this and went to Hornblower & Weeks, accompanied by Rasof. There she drew on her account a check for the sum of $1250. At his suggestion this check was taken over to Faroll Bros., where she, in Rasof's presence, told Rosenthal that she would like to have the money, because Rasof had said that the insur-

ance company would not accept the check. Rosenthal replied that they did not have $1250 in the office then, as it was after office hours. She then told Rosenthal that it would be all right to give the money to Rasof the next day. She indorsed the check and left it at Faroll's. That evening, October 10, the cashier of Faroll Bros. gave Rasof $250 on account of the check at his request and on the following day gave him the remaining $1000. In signing a receipt for this $1250 Rasof not only signed his own name but also the name of Anna Gibbons.

The annuity policy was never delivered to Mrs. Gibbons. About two weeks after October 10 she met Rasof and asked him why the policy had not arrived and what he had done about the money in the wheat market. He replied that it sometimes took three weeks for a policy to arrive, and told her not to be in a hurry about the wheat because he was making good and would surprise her. She told him she would like to see the wheat account and wanted it put in her own name, because she was going to Florida. He then promised to send her a check but did not do so, always putting her off with different excuses from week to week. In November he called her on the telephone and told her he could not get the annuity—that he had lost some money. After repeated requests he agreed to meet her in the office of his lawyer, Gershow, and said he would bring her a check, and wanted to talk to her about something very important. She met him at Gershow's office, and he there asked her to sign a release which the lawyer had prepared, releasing him from all claims of every kind, past and present. His request, he said, was only to protect himself, and he insinuated that someone at Faroll Bros. had telephoned his wife, telling her that her husband was around the stock market with a woman. Mrs. Gibbons refused to sign the release but took a copy away with her, and it is shown as an exhibit in the record. Rasof did not then, or later, make any accounting or pay her any

money on her wheat account or deliver the annuity policy to her, for which she paid him $1250.

Lee Bredman testified that on August 24, 1934, the day following the deposit of $5000 by Mrs. Gibbons, Rasof had a conversation with him with reference to a withdrawal of $3250 from that account; that Rasof requested the check, saying that Mrs. Gibbons wanted that money and that he wanted to open a grain account somewhere with the cash that he received. Mrs. Gibbons was not present during this conversation. Edward M. Rosenthal, manager for Faroll Bros., and Joseph Rosenstein, their cashier, corroborated those portions of Mrs. Gibbons' testimony relating to deposits and checking out of funds in their offices. Rosenthal also testified that Rasof had no grain account with his firm, either in his own name or in that of Mrs. Gibbons, after August 23, 1934.

In view of the foregoing it must be evident that no grounds exist for a reversal of the judgment. Without again reciting the details, suffice it to say that the whole course of conduct pursued by Rasof in persuading Mrs. Gibbons to liquidate her stock account so he could gamble with her money in wheat, his withdrawal of the $3250 for that ostensible purpose, his failure to account to her or to show her that he ever placed the money in wheat futures, and his final fraudulent conversion of her $1250 payment on her annuity contract—these acts and the eager methods used in cashing her checks all justified the verdict of guilty. His defense that she had authorized him to speculate with her money and that there was no conversion since it was lost with her consent is specious, since no proof was submitted that he ever gambled with it or showed any account to her of its expenditure or loss. Nor can it be said that the $1250 was paid to him for any speculative transaction, even though he may have used it for such a purpose. The testimony of Mrs. Gibbons is not impeached or contradicted in any way but seems credible and is corroborated in many

particulars by other testimony and exhibits. It is a general rule that positive testimony of a credible witness, uncontradicted and unimpeached either by positive evidence or by circumstantial evidence, intrinsic or extrinsic, cannot be disregarded but must control the decision of a court or jury. *People* v. *Davis,* 269 Ill. 256; *Quack Ting* v. *United States,* 140 U. S. 270.

The judgment is affirmed.

*Judgment affirmed.*